UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

FTUTB, INC.,

    *Plaintiff*,

v.

WISCONSIN SURGERY CENTER, LLC,
VISHAL LAL, and
THOMAS STAUSS,

    *Defendants*.

No.

## COMPLAINT

Plaintiff FTUTB, INC., by and through its attorneys, Blank Rome LLP and Godfrey & Kahn, S.C., bring this Complaint against defendants WISCONSIN SURGERY CENTER, LLC, VISHAL LAL, and THOMAS STAUSS, and state as follows:

### Nature of Action

1. Plaintiff FTUTB, Inc. is the administrative agent to the Secured Lenders[1] of Advanced Pain Management Holdings, Inc. ("APM Holdings"), the parent company of a group of businesses engaged in providing administrative support to companies that provide pain treatment to 43,000 patients in Wisconsin and Minnesota. APM Holdings and its subsidiaries and affiliates serve high-risk patients, including the elderly and people suffering from opioid addiction.

2. Defendant Vishal Lal is the former Chief Executive Officer of APM Holdings; Advanced Pain Management, LLC; and APM Wisconsin MSO, LLC ("APM Wisconsin"). He was an integral part of a $100-plus million loan transaction for APM Holdings with the Secured

---

[1] The "Secured Lenders" to APM Holdings include, but are not limited to, several entities affiliated with FTUTB.

Lenders and executed a series of amendments reaffirming APM Holdings' obligations thereunder, including a pledge of all collateral to the Secured Lenders. Throughout Lal's term with APM Holdings, he also ran a side-business known as Wisconsin Surgery Center, LLC ("Wisconsin Surgery"). Lal, however, was barred from competing against, or soliciting doctors to help him compete against, entities affiliated with APM Holdings. He owed fiduciary duties of loyalty to APM Holdings' affiliates.

3. Unbeknownst to the Secured Lenders, and upon information and belief, while Lal was still CEO of APM Holdings and continuing through today, Lal and Wisconsin Surgery have been directly competing with APM Holdings and its affiliates, and he also has been soliciting doctors in violation of his employment agreements. On information and belief, Lal and Wisconsin Surgery secretly engaged APM Holdings-affiliated doctors, including Defendant Stauss, a key and critical producer, to provide pain treatments for patients at Wisconsin Surgery. These doctors knowingly violated their own employment agreements by competing. Each pain treatment performed at Wisconsin Surgery by Stauss and the other doctors wrongfully diverted to Wisconsin Surgery the rights to fees payable derived from the physicians' revenue streams and earning potential, which Defendants knew belonged to APM Holdings and affiliated entities and had been pledged to the Secured Lenders.

4. Lal's representations to the Secured Lenders in loan amendments about protecting the Secured Lenders' collateral and ensuring the validity and extent of their liens were knowingly false when he made them. Lal was directly competing with the company that he was running. Those false statements induced the Secured Lenders to continue to advance funds and forbear from exercising post-default remedies against APM Holdings and its affiliated entities.

5. Though the full extent of Defendants' fraud and conversion remains under investigation, the results have been catastrophic for APM Holdings and the Secured Lenders' collateral position. But for Defendants' fraud and conversion of the Secured Lenders' collateral, the Secured Lenders would have acted to secure their collateral and exercise post-default remedies.

6. The Secured Lenders have an immediate possessory interest in and rights to the collateral staked by APM Holdings and the guarantors[2] for the loan, and as the administrative agent for the loan, FTUTB can bring this action on behalf of the Secured Lenders. The Secured Lenders have direct causes of action here for fraud by Lal and Wisconsin Surgery, conversion of the collateral, and tortious interference. The Secured Lenders have suffered money damages to be determined at trial in an amount in excess of $50 million. But money damages alone are inadequate. Defendants should be enjoined from converting the Secured Lenders' collateral, including the solicitation of APM Holdings' affiliated doctors and performing competing pain treatments.

## Jurisdiction and Venue

7. The Court has diversity jurisdiction over this action pursuant to 28 U.S.C § 1332. FTUTB, Inc., is a corporation incorporated in Delaware with its principal place of business in New York. Defendants Vishal Lal and Thomas Stauss are citizens of Wisconsin, and upon information and belief, Defendant Wisconsin Surgery's members, including Lal, are all citizens of Wisconsin.

---

[2] The guarantors include APM Intermediate, Inc.; Advanced Pain Management, LLC; APM Wisconsin MSO, LLC; APM Minnesota MSO, LLC; Access Medical Center LLC; Sheboygan Medical Center LLC; Surgi Center of Greater Madison LLC; Wisconsin Health Center, LLC; United Medical Center LLC; Pain Centers Of Wisconsin - Kenosha, LLC; Pain Centers Of Wisconsin - Franklin, LLC; Pain Centers Of Wisconsin - Fox Point, LLC; Pain Centers Of Wisconsin – Appleton, LLC; Pain Centers Of Wisconsin – Sauk Prairie, LLC; Pain Centers Of Wisconsin – West Bend, LLC; APM Indiana MSO, LLC; Pain Centers Of Indiana – Evansville, LLC.

There is complete diversity of citizenship between Plaintiff and Defendants, and the amount in controversy exceeds $75,000.

8. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to the controversy occurred within the Milwaukee Division of the Eastern District of Wisconsin.

9. This Court has personal jurisdiction over Defendants because the acts and omissions that are the bases of the claims set forth herein occurred in this judicial district.

## Parties

10. Plaintiff FTUTB is the administrative agent for the Secured Lenders to APM Holdings.

11. Defendant Wisconsin Surgery is a Wisconsin limited liability company with its principal place of business in Milwaukee, Wisconsin. Wisconsin Surgery operates an ambulatory surgery center in Milwaukee, and one of its specialties is pain management.

12. At various times between on or about May 1, 2008, and continuing until in or around March 2019, Defendant Vishal Lal was the Chief Executive Officer of APM Holdings; a wholly-owned subsidiary named Advanced Pain Management, LLC; and APM Wisconsin, which is a wholly-owned subsidiary of Advanced Pain Management, LLC. Lal also had employment contracts with Advanced Pain Management, LLC, and APM Wisconsin. In these roles, Lal was contractually obligated to perform executive management and administrative services and agreed to devote his best efforts and full business time to rendering services for these entities. Additionally, Lal promised that, while employed by Advanced Pain Management, LLC, and APM Wisconsin and for two years after, he would not solicit anyone to work for any entity that competes with Advanced Pain Management, LLC, and APM Wisconsin. Lal also owns shares in APM Holdings' parent entity with a cost basis at over $1 million.

13. Additionally, beginning no later than in or around May 2008, Lal was and remains an owner, member of the Board of Directors, and manager of Wisconsin Surgery. As part of Lal's employment contracts with Advanced Pain Management, LLC, and APM Wisconsin, Lal was permitted to hold roles at Wisconsin Surgery, but he was expressly prohibited from encouraging or initiating any efforts to increase the number of pain management procedures performed at Wisconsin Surgery beyond the levels performed in 2010. He also continued to owe fiduciary duties to APM Holdings and its affiliates.

14. Defendant Thomas Stauss is a medical doctor licensed to practice in Wisconsin. Stauss also holds shares in APM Holdings' parent entity with a cost basis at just under $1 million.

**Factual Allegations**

I. **Background Concerning Relevant Entities**

15. APM Holdings is the parent company of a group of businesses engaged in providing administrative support to companies that provide safe, interventional pain management procedures and therapies. APM Holdings and its subsidiaries and affiliates work with more than 50 specialized healthcare providers at 25 health centers throughout the Midwest.

16. Advanced Pain Management, S.C. ("APM SC"), is a Wisconsin service corporation that is in the business of treating patients for pain, pain management, and pain medicine. At all relevant times, APM SC employed physicians in a variety of fields, including anesthesiology, neurology, and rehabilitative medicine. Each doctor's employment was governed by an employment contract between APM SC and that doctor. Among the terms in each employment contract were non-compete, non-solicitation, confidentiality, and remedies provisions. In general, the doctors promised not to compete with APM SC while employed by APM SC and for two years following termination of employment.

17. The doctors further promised not to solicit any patient for the purposes of providing goods or services in competition with APM SC while employed by APM SC and during that same two-year, post-employment period. Additionally, each doctor promised that, while employed by APM SC and for two years after, he or she would not solicit any person who was any employee of APM SC to work for any entity that competes with APM SC. Each doctor agreed to maintain the secrecy of certain confidential information he or she learned while employed by APM SC. And each doctor agreed that as a result of a breach of any of these provisions, APM SC would be entitled "to preliminary and permanent injunctive and other equitable relief" against each doctor in breach.

18. At all relevant times, one of APM Holdings' subsidiaries has been APM Wisconsin. APM Wisconsin is a management services company. On or about May 1, 2008, APM Wisconsin entered into a management services agreement with APM SC, and per that agreement, APM Wisconsin provided management, administration, purchasing services and support, and other management support needs to APM SC. In exchange for these services, APM SC generated fees from support for physician services that it owed and paid to APM Wisconsin under the management services agreement. In other words, APM SC was obligated to pay APM Wisconsin a fee that was calculated as the revenue of APM SC minus APM SC's expenses.

## II. The APM Holdings Credit Agreement, and APM Holdings' Default

19. Lal helped found APM Holdings' predecessor ("APM Predecessor") with a group of doctors in or around 1999, and for the next several years, the company experienced steady growth.

20. In or around 2008, Lal and other investors sold a portion of APM Predecessor for approximately $79 million. Upon information and belief, Lal received a significant payout at that time.

6

21. In or around 2010, the APM Predecessor was sold again, this time to Chicago Growth Partners and other investors for a total purchase price of about $178 million, with Chicago Growth Partners and other investors providing about $81 million of equity for the transaction. An entity affiliated with FTUTB helped finance the acquisition. Upon consummation of the transaction, the borrower became APM Holdings, and Chicago Growth Partners owned about 53% of APM Holdings, controlled the APM Holdings board of directors, and decided to retain Lal as CEO. Also as a result of the transaction, Lal received a cash distribution of more than $5.9 million, and Stauss and several other doctors each received a cash distribution of more than $6.3 million.

22. In 2013, Chicago Growth Partners approached its lenders about a dividend recapitalization transaction, pursuant to which APM Holdings would incur new debt to pay a special dividend to shareholders, including Chicago Growth Partners, Lal, and Stauss. An entity affiliated with FTUTB led the financing of the recapitalization transaction, providing a $145 million loan commitment to APM Holdings. The FTUTB affiliate also increased its loan commitment from $23 million to $96 million as part of the transaction. On or about February 26, 2013, the dividend recapitalization transaction closed, with APM Holdings as borrower under a credit agreement with the Secured Lenders (the "Credit Agreement").

23. On information and belief, Lal (as CEO) was an integral part of negotiating and arranging the February 2013 transaction and final Credit Agreement, and Lal, Chicago Growth Partners, and a number of Advanced Pain Management doctors cashed out. About $48 million of the new loan was used to fund a special dividend to the equity holders, including Lal, Chicago Growth Partners, and other doctors. At closing, advances from Secured Lenders under the Credit Agreement funded payments to Chicago Growth Partners of more than $25 million. Lal received over $1 million, and Stauss and other doctors each received over $900,000.

7

24. Two years after the Credit Agreement was executed, in or around 2015, APM Holdings first defaulted on the Credit Agreement. At that time, APM Holdings failed to comply with certain financial covenants set forth in the Credit Agreement for the period ending March 31, 2015. The Secured Lenders waived that default. Beginning no later than in or around 2016, APM Holdings again went into default on the loan and has remained in default ever since. The maturity date of the loan has been extended on several occasions since then.

25. According to the terms of the Credit Agreement, APM Holdings and the guarantors agreed to grant the Secured Lenders' administrative agent first-priority security interests in all "collateral" and to take all necessary steps to preserve and protect the collateral during the period of the loan. The Credit Agreement defined "collateral" to include "property, real or personal, tangible or intangible, now existing or hereafter acquired," that could become subject to a security interest or lien to secure any or all of the loans, advances, debts, liabilities, or other obligations owed by APM Holdings. As such, the fees generated by APM SC from services performed by physicians, which APM SC owed and paid to APM Wisconsin in support of services performed by APM Wisconsin under the management services agreement, constituted collateral pledged by APM Holdings and the guarantors to satisfy obligations to the Secured Lenders under the Credit Agreement. Additionally, technical fees derived directly by APM Wisconsin in connection with those services also constituted collateral. Per the Credit Agreement, APM Holdings was obligated to take all necessary steps to preserve that collateral for the Secured Lenders.

26. Since the execution of the Credit Agreement on or about February 26, 2013, the parties to the Credit Agreement have executed sixteen amendments. Lal personally signed at least five of the amendments in his capacity as CEO of APM Holdings: the Seventh Amendment, dated February 26, 2018; the Eighth Amendment, dated May 30, 2018; the Ninth Amendment, dated

August 28, 2018; the Tenth Amendment, dated November 27, 2018; and the Eleventh Amendment, dated February 26, 2019. All of the amendments Lal signed related to defaults by APM Holdings.

27. In signing each amendment, Lal certified that "each of the representations and warranties of [APM Holdings and the guarantors] contained in [the Credit Agreement and other associated documents] are true, correct and complete as of the date [of the amendment] (or any earlier date with respect to which any such representation or warranty relates) in all material respects." Lal further certified that APM Holdings and each guarantor of the loan ratified and reaffirmed "all of its payment and performance obligations, contingent or otherwise," under the Credit Agreement and related documents. Additionally, Lal certified that the Credit Agreement, including the lien rights and duty to protect collateral, "shall remain in full force and effect" and is thus "ratified and confirmed." As discussed below, Lal repeatedly made fraudulent misrepresentations—Lal lied—when he certified these amendments. By signing each amendment, Lal certified that APM Holdings was preserving and protecting the pledged collateral during the period of the loan. Yet Lal knew when he signed each amendment that significant collateral was being converted to the possession of Wisconsin Surgery; that collateral was the rights to fees payable from APM SC to APM Wisconsin derived from services performed in support of the physicians' revenue streams and earning potential and technical fees derived by APM Wisconsin.

28. In or around March 2019, Lal was removed as CEO, and new management was appointed. Recently, COVID-19 and other factors, including Lal's disloyalty, have caused further financial strain. Had the Secured Lenders known earlier about Lal's fraud and deception, they would have enforced their post-default rights and remedies, up to and including the potential foreclosure and sale of the business. The Secured Lenders also would have acted sooner to ensure

that APM SC doctors were barred from competing, thereby preserving more of the collateral that the Secured Lenders are owed.

### III. Defendants' Conversion of APM Holdings' Loan Collateral

29. One of Wisconsin Surgery's specialties is pain management, meaning that Wisconsin Surgery directly competes with APM Holdings' affiliated entities. Lal's employment contract prohibited Lal while employed by Advanced Pain Management, LLC, and APM Wisconsin, and for two years thereafter, from soliciting doctors to compete with APM Holdings. Yet, since at least 2017, Lal has consistently breached his duties of loyalty to, and his employment contracts with, Advanced Pain Management, LLC, and APM Wisconsin. Lal has recruited multiple physicians who are employed by and under contract with APM SC to work for Wisconsin Surgery. There—according to Wisconsin Surgery's own website—these physicians have conducted patient visits and performed patient services relating to pain management in direct competition with APM Holdings and affiliated entities.

30. One of these doctors is Stauss. On information and belief, Stauss conspired with Lal and has been working for Wisconsin Surgery in breach of his own duties to APM SC and employment agreements since at least in or around February 2019. By working for Wisconsin Surgery and not APM SC, Stauss has helped Lal and Wisconsin Surgery tortiously interfere with APM Holdings' ability to abide by the Credit Agreement as well as convert the collateral of the Secured Lenders—the rights to fees payable from APM SC to APM Wisconsin derived from services performed in support of the physicians' revenue streams and earning potential as well as technical fees—to the possession of Wisconsin Surgery.

31. The same holds for the other doctors under employment contracts with APM SC. On information and belief, these other doctors, like Stauss, have been conspiring with Lal and working for Wisconsin Surgery in direct competition with APM SC. Like Stauss, these other

doctors have helped Lal and Wisconsin Surgery tortiously interfere and convert the collateral of the Secured Lenders.

32. Lal's, Stauss's, and Wisconsin Surgery's tortious interference and conversion continues today. According to Wisconsin Surgery's website, Stauss and other APM SC physicians today continue to provide pain treatments and medicine to patients at Wisconsin Surgery, in direct competition with APM SC and direct violation of their employment contracts. Lal no longer works for APM Holdings; the company terminated his employment in or around March 2019. But, Lal's employment contracts barred Lal from competing against Advanced Pain Management, LLC, and APM Wisconsin and soliciting others to compete at Wisconsin Surgery or elsewhere for two years following the end of his employment. Lal is still within that two-year window and thus continues to breach his duties of loyalty and contractual promises.

## IV. Lal's Fraud

33. On information and belief, while Lal, Stauss, and Wisconsin Surgery converted millions of dollars of APM Holdings' collateral to Wisconsin Surgery, Lal repeatedly committed fraud against the Secured Lenders. Throughout 2017 and 2018, and into 2019, while Lal was knowingly converting collateral, Lal repeatedly misrepresented to the Secured Lenders that APM Holdings was taking all necessary steps to preserve that collateral for the Secured Lenders.

34. Between in or around February 2018 and February 2019, Lal personally signed five amendments to the Credit Agreement. Lal did so as he secretly recruited APM SC doctors to work at Wisconsin Surgery, and as Stauss and other doctors worked at Wisconsin Surgery instead of APM SC. In each amendment, Lal certified that APM Holdings' representations and warranties in the Credit Agreement remained "true, correct and complete" and further certified that APM Holdings reaffirmed its payment and performance obligations, reaffirmed guarantees and grants of security interests and liens, reaffirmed that those security interests and liens secured APM

11

Holdings' outstanding obligations under the Credit Agreement, and reaffirmed that the Credit Agreement remained in full force. Per that last provision, Lal thus certified in signing each amendment that the rights to fees payable from APM SC to APM Wisconsin derived from services performed in support of physicians' revenue streams and earning potential as well as technical fees derived by APM Wisconsin constituted collateral and that APM Holdings was obligated to take all necessary steps to preserve that collateral for the Secured Lenders.

35. Because Lal knew that Stauss and other doctors were working for Wisconsin Surgery in breach of their employment agreements with APM SC, Lal knew when he certified the amendments in 2018 and 2019 on behalf of APM Holdings that the information he was certifying as true in fact was not true. In other words, at a time when APM Holdings was in default on the Credit Agreement and could not repay its debts to the Secured Lenders, Lal was converting collateral away from APM Holdings and its affiliated entities to Wisconsin Surgery, including revenues generated by Stauss and other physicians employed by APM SC. Lal then repeatedly lied and misrepresented to the Secured Lenders that the Credit Agreement and subsequent amendments remained true, correct, and complete, and that APM Holdings was securing all collateral to the loan, including the rights to the fees payable from APM SC to APM Wisconsin derived from services performed in support of physician revenue streams and earning potential as well as technical fees derived by APM Wisconsin.

36. The Secured Lenders have suffered money damages to be determined at trial in an amount in excess of $50 million. Yet, money damages alone would not provide an adequate remedy for Defendants' conspiracy, fraud, conversion, and tortious interference. Accordingly, FTUTB and the Secured Lenders seek injunctive relief enjoining Defendants and all those acting in concert with them from converting the Secured Lenders' collateral.

## Claims for Relief

### COUNT ONE
*Fraud,*
Against Defendants Wisconsin Surgery Center and Vishal Lal

37. The preceding and succeeding Paragraphs are incorporated herein by reference.

38. In signing five amendments to the Credit Agreement in 2018 and 2019, Lal made fraudulent misrepresentations and omitted material information the absence of which made his statements misleading.

39. Lal's representations were untrue when he made them. Specifically, Lal signed each amendment falsely representing to the Secured Lenders that APM Holdings' representations and warranties in the Credit Agreement remained "true, correct and complete." Additionally, Lal falsely represented that APM Holdings reaffirmed its payment and performance obligations, guarantees and grants of security interests and liens, that those security interests and liens secured APM Holdings' outstanding obligations under the Credit Agreement, and that the Credit Agreement remained in full force. Thus, in signing each amendment, Lal fraudulently represented to the Secured Lenders that APM Holdings was taking all necessary steps to preserve collateral—including the rights to fees payable from APM SC to APM Wisconsin derived from services performed in support of Stauss and other physician revenue streams and earning potential as well as technical fees derived by APM Wisconsin—for the Secured Lenders.

40. Lal knew when he made each representation and certified the truth of each amendment that his representations were not true, or Lal recklessly made each certification without caring about its truth.

41. Lal made each representation and certified the truth of each amendment intending to induce the Secured Lenders into continuing to operate as if there were no additional, undisclosed material breaches of the Credit Agreement. To their detriment, the Secured Lenders believed that

Lal's statements were true, and they relied on Lal's representations. As a result, the Secured Lenders continued to advance funds to APM Holdings, deferred receipt of cash interest payment from APM Holdings, and did not exercise more severe remedies to recoup its loan.

42. Lal's fraud proximately caused injuries to Secured Lenders in an amount to be determined at trial in excess of $50 million.

## COUNT TWO
*Conversion,*
*Against Defendants Wisconsin Surgery Center, Vishal Lal, and Thomas Stauss*

43. The preceding and succeeding Paragraphs are incorporated herein by reference.

44. The revenue generated by, and the earning potential of, physicians under employment contracts with APM SC created fees owing by APM SC to APM Wisconsin under the management services agreement, which fees constituted collateral pledged by APM Wisconsin and APM Holdings to satisfy obligations to the Secured Lenders under the Credit Agreement. Lal tortiously induced, on Wisconsin Surgery's behalf, Stauss and other physicians to work for Wisconsin Surgery. As a result of the work by Stauss and other APM SC employee-doctors working for Wisconsin Surgery while under contract to work for and not compete against APM SC, that collateral was wrongfully transferred from APM Holdings to Wisconsin Surgery.

45. APM Holdings is in default of the Credit Agreement, and as such, the Secured Lenders are entitled to exercise remedies to enforce possession of the collateral.

46. Wisconsin Surgery, Lal, and Stauss transferred this collateral without the consent of APM Holdings or the Secured Lenders, which resulted in serious interference with the rights of the Secured Lenders as well as their abilities to possess that collateral.

47. Wisconsin Surgery's, Lal's, and Stauss's conversion proximately caused injuries to Secured Lenders in an amount to be determined at trial in excess of $50 million.

## COUNT THREE
*Tortious Interference with Contract,*
*Against Defendants Wisconsin Surgery Center, Vishal Lal, and Thomas Stauss*

48. The preceding and succeeding Paragraphs are incorporated herein by reference.

49. The Secured Lenders have been in and remain in a Credit Agreement with APM Holdings.

50. Wisconsin Surgery, Lal, and Stauss interfered with the contractual relationship between the Secured Lenders and APM Holdings. As discussed above, at the encouragement and direction of Lal, Stauss and other APM SC doctors worked at Wisconsin Surgery and not for APM SC. As a result, APM Wisconsin and APM Holdings lost to Wisconsin Surgery the rights to fees payable from APM SC from the physicians' revenue streams and earning potential as well as technical fees that APM Wisconsin would have derived directly, meaning that APM Holdings and APM Wisconsin did not have those fees available for collateral as expected per the Credit Agreement. Wisconsin Surgery, Lal, and Stauss thus caused APM Holdings not to be able to abide by the terms of the Credit Agreement requiring APM Holdings to preserve and protect the collateral during the period of the loan.

51. Because Lal meant to, and did, induce Stauss and other physicians to work for Wisconsin Surgery when Lal and Stauss knew that Stauss and the other physicians were under contract to work for APM SC, this interference by Wisconsin Surgery, Lal, and Stauss was intentional.

52. Neither Wisconsin Surgery, nor Lal, nor Stauss had any contractual right or other privilege to interfere with APM Holdings' ability to perform under the Credit Agreement.

53. Wisconsin Surgery's, Lal's, and Stauss's tortious interference with contract proximately caused injuries to the Secured Lenders in an amount to be determined at trial in excess of $50 million.

# COUNT FOUR
*Conspiracy to Commit Fraud, Conversion, and Tortious Interference with Contract, Against Defendants Wisconsin Surgery Center, Vishal Lal, and Thomas Stauss*

54. The preceding and succeeding Paragraphs are incorporated herein by reference.

55. Lal, on behalf of himself and Wisconsin Surgery, communicated with Stauss and other physicians who, at that time, were in employment contracts with APM SC under which they were required to perform physician services for APM SC and not any competitors. Lal himself was also under contract when he first communicated with those physicians not to solicit anyone to work for any competitor of APM Holdings and affiliates, and Lal remains under those same contractual obligations still today.

56. Lal recruited Stauss and the other physicians to perform for Wisconsin Surgery precisely those medical services that, per the physicians' employee agreements with APM SC, the physicians were required to perform for APM SC.

57. Lal and Wisconsin Surgery knew that by recruiting Stauss and the other physicians to Wisconsin Surgery, he was causing the conversion of APM Holdings' collateral—the rights to fees payable as a result of the physicians' revenue streams and earning potential—to Wisconsin Surgery, was tortiously interfering with APM Holdings' ability to abide by the terms of the Credit Agreement, and was tortiously interfering with the ability of APM Holdings to be sold for the highest price possible.

58. Pursuant to this conspiracy, Stauss and other APM SC-employed physicians performed patient work on behalf of Wisconsin Surgery and not APM SC. While Stauss and these other physicians worked for Wisconsin Surgery, they continued to receive compensation from APM SC per the terms of their employment contracts.

59. Lal and Stauss were well aware of the prohibitions on Stauss working for an APM SC competitor. On information and belief, as CEO, Lal knew that physicians working for

APM SC entered into employment agreements that contained restrictive covenants, including non-compete clauses. Indeed, on or about December 1, 2017, Stauss entered into an amendment to his APM SC employment contract, which Lal signed on behalf of APM SC.

60. Meanwhile, because Stauss signed his own employment agreement acknowledging his understanding of the terms of that agreement, he knew that his employment agreement prohibited him from working for a competitor. Lal's motive to have Stauss and other physicians work for Wisconsin Surgery flowed from his minority ownership of Wisconsin Surgery. Stauss's motive was that he was paid by APM SC while he worked for Wisconsin Surgery.

61. Wisconsin Surgery's, Lal's, and Stauss's conspiracy proximately caused injuries to the Secured Lenders in an amount to be determined at trial in excess of $50 million.

## Request for Relief

62. WHEREFORE, Plaintiff prays that the Court:

- Award Plaintiff compensatory, consequential, and punitive damages in an amount to be determined at trial;

- Enter preliminary and permanent injunctive relief enjoining Defendants and those acting in concert with them from interfering with existing contracts or the possible sale of APM Holdings;

- Impose a constructive trust against Lal and Stauss;

- Award pre-judgment interest in favor of Plaintiff;

- Award Plaintiff attorneys' fees and expenses; and

- Grant such additional relief as the Court finds appropriate and just.

## Jury Demand

Plaintiff FTUTB, Inc. hereby requests trial by jury.

Dated this 8th day of May, 2020.

By: *s/ Daniel T. Flaherty*
    Daniel T. Flaherty, SBN 1011357
    David R. Konkel, SBN 1097244
    GODFREY & KAHN, S.C.
    833 East Michigan Street, Suite 1800
    Milwaukee, WI 53202-5615
    Phone: 414-273-3500
    Fax: 414-273-5198
    dflaherty@gklaw.com
    dkonkel@gklaw.com

-and-

    William J. Dorsey
    Paul H. Tzur (Application to Eastern District will be forthcoming)
    BLANK ROME, LLP
    444 W. Lake Street, Suite 1650
    Chicago, Illinois 60606
    Phone: 312-776-2600
    Fax: 312-776-2601
    wdorsey@blankrome.com
    ptzur@blankrome.com
*Attorneys for Plaintiff FTUTB, Inc.*

22292307.2