UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

FTUTB, INC.,

          Plaintiff,

    v.                                            Case No. 20-CV-706

WISCONSIN SURGERY CENTER LLC, et al.,

          Defendants.

---

## DECISION AND ORDER

---

### 1. Background

On September 22, 2020, the court granted, in part, motions to dismiss filed by defendants Wisconsin Surgery Center, LLC, Vishal Lal, and Thomas Stauss. *FTUTB, Inc. v. Wis. Surgery Ctr. LLC*, No. 20-CV-706, 2020 U.S. Dist. LEXIS 173090 (E.D. Wis. Sep. 22, 2020). The court allowed plaintiff FTUTB, Inc. to file an amended complaint, which it did on October 8, 2020. (ECF No. 33.) The defendants filed renewed motions to dismiss (ECF Nos. 34, 36), which are ready for resolution. All parties have consented to the full jurisdiction of this court under 28 U.S.C. § 636(c).

The following facts are taken from the amended complaint, and the court accepts them as true for purposes of the pending motions to dismiss. *See Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588 (7th Cir. 2014).

On or about February 26, 2013, several entities (identified only as the "Secured Lenders") loaned Advanced Pain Management Holdings, Inc. (APMH) over $100 million. (ECF No. 33, ¶¶ 2, 27.) This transaction was memorialized in a Credit Agreement (ECF No. 33, ¶ 11), which FTUTB appended to its amended complaint and which the court considers under Federal Rule of Civil Procedure 10(c). APMH's Chief Executive Officer Vishal Lal was "an integral part of" this transaction. (ECF No. 33, ¶ 2; *see also id*. ¶ 13.) Lal also ran Wisconsin Surgery Center, LLC. (ECF No. 33, ¶ 2; *see also id*. ¶ 14.) As part of the transaction, Lal "was barred from competing against, or soliciting doctors to help him compete against, entities affiliated with APMH. He owed fiduciary duties of loyalty to APMH's affiliates." (ECF No. 33, ¶ 2; *see also id*. ¶ 13.)

According to the terms of the Credit Agreement, APMH agreed to grant to the "administrative agent," for the benefit of the Secured Lenders, security interests in certain collateral and to take all steps necessary to preserve and protect the collateral during the period of the loan. (ECF No. 33, ¶ 26.) The collateral consists of the right to certain fees payable derived from services performed in support of certain physicians' "revenue streams and earning potential as well as technical fees[.]" (*Id.*, ¶ 31.)

"FTUTB is the current administrative agent for the Secured Lenders to APMH. The administrative agent, the Secured Lenders, and APMH are all parties to the Credit Agreement, and the Credit Agreement governs the relationship between the three parties." (ECF No. 33, ¶ 11.) Under the Credit Agreement, FTUTB has a security interest and lien upon APMH's personal and real property. (ECF No. 33, ¶ 11 a.) FTUTB has administrative control over all pledged collateral and maintains a first-priority lien on that collateral. (ECF No. 33, ¶ 11 a.) In the event of a default under the Credit Agreement, FTUTB alone determines how and in what order the secured lenders are paid from any funds received from APMH. (ECF No. 33, ¶ 11 b.)

FTUTB's rights and obligations include the right "to bring lawsuits on behalf of the Secured Lenders for violations of applicable law as well as breaches of the Credit Agreement and loan financing documents." (ECF No. 33, ¶ 11 c.) No individual Secured Lender may take any action to enforce rights under the Credit Agreement or any other associated financing document without first obtaining FTUTB's permission. (ECF No. 33, ¶ 11 d.)

Since execution of the Credit Agreement the parties have executed 16 amendments, the last of which is dated February 26, 2019. (ECF No. 33, ¶ 27.) In signing each amendment, Lal represented that APMH was preserving and protecting the pledged collateral during the period of the loan. (*Id.*, ¶ 28.)

APMH has been in default under the Credit Agreement since 2016. (ECF No. 33, ¶ 25.) Nonetheless, based on Lal's assurances and representations, FTUTB and the Secured Lenders continued to advance funds to APMH and defer exercising their post-default remedies. (ECF No. 33, ¶ 4.)

Unbeknownst to FTUTB and the Secured Lenders, however, Lal was competing against APMH. (ECF No. 33, ¶ 3.) Among other things, Lal was soliciting doctors, including defendant Dr. Thomas Stauss, to violate their employment agreements with APMH, and providing pain management services through the Surgery Center. (ECF No. 33, ¶ 3.) By this competition the defendants converted the collateral pledged by APMH under the Credit Agreement. (ECF No. 33, ¶¶ 5, 30-33.)

The amended complaint does not contain a claim for breach of the Credit Agreement, and neither the Secured Lenders nor APMH is a party to this action. Rather, the four causes of action are: (1) Fraud, against Wisconsin Surgery Center and Lal; (2) Conversion, against all three defendants; (3) Tortious Interference with Contract, also against all three defendants; and (4) Conspiracy to Commit Fraud, Conversion, and Tortious Interference with Contract, again against all of the defendants.

The fraud claim alleges that Lal "fraudulently represented to the administrative agent and the Secured Lenders that APMH was taking all necessary steps to preserve collateral." (ECF No. 33, ¶ 40.) That representation was untrue. (*Id.*, ¶ 41.) FTUTB and the Secured Lenders believed the representations to be true, and relied on them by

4

"continu[ing] to advance funds to APMH, defer[ring] receipt of cash interest payment from APMH, and [] not exercise[ing] more severe remedies to recoup the loan." (*Id.*, ¶ 42.)

The conversion, interference with contract, and conspiracy claims all allege that the defendants "proximately caused injuries to FTUTB, for the benefit of the Secured Lenders[.]" (ECF No. 33, ¶¶ 50, 56 and 64.)

2. **Applicable Law**

A defendant may move under Fed. R. Civ. P. 12(b)1) to dismiss a claim if it believes the court lacks subject matter jurisdiction. "[A] plaintiff faced with a 12(b)(1) motion to dismiss bears the burden of establishing that the jurisdictional requirements have been met." *Ctr. for Dermatology*, 770 F.3d at 588-89. The plaintiff's burden is to show that the court plausibly has jurisdiction. *Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015).

3. **Analysis**

On the surface, the amended complaint adequately alleges that complete diversity of citizenship exists among the parties. 28 U.S.C. § 1332(a)(1). FTUTB is a Delaware corporation whose principal place of business is in New York (ECF No. 33, ¶ 8) and, thus, is a citizen of Delaware and New York. 28 U.S.C. § 1332(c)(1). The defendants are all citizens of Wisconsin. (ECF No. 33, ¶ 8); *Thomas v. Guardsmark, LLC*, 487 F.3d 531, 534 (7th Cir. 2007).

"When a lawsuit involves groups of individuals or parties representing groups of individuals, however, the determination is more complicated." *N. Tr. Co. v. Bunge Corp.*, 899 F.2d 591, 594 (7th Cir. 1990). "[A] party who has no real interest in the outcome of the litigation should not be able to use its citizenship to transform a local controversy into a federal case." *CCC Info. Servs. v. Am. Salvage Pool Ass'n*, 230 F.3d 342, 346 (7th Cir. 2000). The defendants argue that the court must look past FTUTB's citizenship and consider the citizenship of the Secured Lenders.

The defendants' motions implicate two rules as to which there is a "rough symmetry"—"the 'real party in interest' standard of Rule 17(a) and the rule that diversity jurisdiction depends upon the citizenship of real parties to the controversy." *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 462 n. 9 (1980). "But the two rules serve different purposes and need not produce identical outcomes in all cases." *Id*.

The focus in the court's prior decision was on whether FTUTB is the real party in interest under Rule 17(a). *FTUTB,* 2020 U.S. Dist. LEXIS 173090, at *8. However, that rule is not the basis of Wisconsin Surgery Center's renewed motion to dismiss. Although Wisconsin Surgery Center asserts that "FTUTB is not the real party in interest for purposes of Rule 17," it states it "does not focus on this affirmative defense at this stage of the litigation" (ECF No. 35 at 4, fn. 2), and no such argument is developed in its brief.

Lal and Stauss seek to dismiss the amended complaint "pursuant to Rules 12 and 17" (ECF No. 36), but they did not submit their own brief in support. Rather, they

6

"incorporate[d] the arguments in the brief in support of the similar motion to dismiss the amended complaint filed by co-defendant Wisconsin Surgery Center (ECF 35)." (ECF No. 36.) Thus, to the extent that Lal and Stauss may have intended to move to dismiss under Rule 17(a), the motion is denied because Wisconsin Surgery Center did not develop any such argument in its brief. The question is solely whether FTUTB is the real party to the controversy.

FTUTB argues that it is a trustee for the Secured Lenders under the Credit Agreement and, thus, only its citizenship, and not that of the Secured Lenders, need be considered for diversity purposes. (*See, e.g.*, ECF No. 37 at 7); *see also Americold Realty Tr. v. ConAgra Foods, Inc.*, 136 S. Ct. 1012, 1016 (2016) (discussing *Navarro Sav. Ass'n*, 446 U.S. at 462-66, and reiterating that, "when a trustee files a lawsuit or is sued in her own name, her citizenship is all that matters for diversity purposes"). FTUTB emphasizes that under the Credit Agreement it is vested with significant discretion and authority. (ECF No. 37 at 4-7.) For example, according to the Credit Agreement, FTUTB is granted "a security interest in and lien upon substantially all of the the[] existing and after acquired personal and real property" of the borrowers. (ECF No. 33-1 at 8.) And on an exhibit to the credit agreement titled "UCC Financing Statements," the administrative agent is designated as the party having the secured interest in each of the underlying loans. (ECF No. 33-1 at 169.)

The defendants counter that the claims are really those of the Secured Lenders and FTUTB is a mere agent or conduit and thus not the real party to the controversy. (*See, e.g.*, ECF Nos. 35 at 3, 6; 39 at 1.)

A handful of decisions of the Court of Appeals for the Seventh Circuit aid the court in resolving the question, but none provides a direct answer to the question presented. The Seventh Circuit waded into the real party to the controversy question in a pair of cases in early 1990. In *National Association of Realtors v. National Real Estate Association*, 894 F.2d 937, 940 (7th Cir. 1990), the court rejected the argument that a professional association was the real party in interest for claims that the defendant defrauded its members by making false representations regarding malpractice insurance. The court emphasized that the members were the parties the defendants solicited, not the association. "The members were in the front line. They received the blow." *Id.* at 940. And any damages that the association recovered would be turned over to its members. *Id.*

In *Northern Trust Co. v. Bunge Corp.*, 899 F.2d 591 (7th Cir. 1990), Northern Trust was the agent for sellers of stock. A dispute arose over a warranty in the stock purchase agreement, and Northern Trust sought a declaratory judgment. In a counterclaim, the purchaser, Bunge Corporation, sought damages. The court concluded that the real parties to the controversy were the sellers of the stock, not Northern Trust. Significant to the court was the fact that Northern Trust's interests were not at stake. *Id.* at 595.

Ten years later the court addressed the real party to the controversy question again in *CCC Information Services, Inc. v. American Salvage Pool Association*, 230 F.3d 342 (7th Cir. 2000). An association of automobile salvage dealers entered into a contract with the plaintiff whereby the members of the association agreed to provide the plaintiff with information about salvaged vehicles. The plaintiff sought a declaratory judgment that it had the right to terminate the agreement and start businesses that arguably violated a non-compete provision in their contract; the association counterclaimed for damages. The plaintiff moved to dismiss the counterclaim for lack of subject matter jurisdiction, arguing that the members of the association were the real parties to the controversy. The court distinguished *National Association of Realtors*, noting that CCC's contract was with the association and, thus, the rights the association was enforcing were its rights and only indirectly those of its members. *Id.* at 347.

Finally, in *Mortgage Electronic Registration Systems v. Estrella*, 390 F.3d 522 (7th Cir. 2004), the court noted in dicta a likely jurisdictional problem in an action brought by Mortgage Electronic Registration Systems (MERS) related to a mortgage. MERS was "a membership organization that records, trades, and forecloses loans on behalf of many lenders, acting for their accounts rather than its own." *Id.* at 524-25. The court observed that MERS appeared to be not a trustee "with title to the corpus" but a "nominee only, holding title to the mortgage but not the note. Each lender appears to be entitled not only to payment as the note's equitable (and legal) owner but also to control any litigation and

9

settlement." *Id.* at 525. Thus, although remanding because it concluded it lacked appellate jurisdiction for unrelated reasons, the court instructed the district court to on remand assess whether complete diversity existed.

This lawsuit charges the defendants with wrongfully diverting to Wisconsin Surgery the rights to fees payable derived from physicians' revenue streams and earning potential which belonged to APMH and affiliated entities. (ECF No. 33, ¶ 3.) As a result, the Secured Lenders lost money that they loaned to APMH. Had APMH paid the Secured Lenders as required by the Credit Agreement, or if the Secured Lenders could recover the collateral, there would be no injury and thus no basis for any claim in the amended complaint. The injuries were primarily (if not exclusively) to the Secured Lenders, supporting the conclusion that FTUTB is not the real party in interest. *See CCC Info. Servs.*, 230 F.3d at 347 (discussing *Nat'l Asso. of Realtors*, 894 F.2d at 940). Although FTUTB alleges it was also injured, the National Association of Realtors likewise alleged personal injuries in its action, yet its allegations proved insufficient to make it the real party to the controversy. *Nat'l Asso. of Realtors*, 894 F.2d at 938. In the amended complaint FTUTB's injuries are always alleged in conjunction with injuries to the Secured Lenders (ECF No. 33, ¶ 44), or in the metaphysically ambiguous terms of it having suffered injuries "for the benefit of the Secured Lenders" (ECF No. 33, ¶¶ 37, 50, 56, 64).

FTUTB alleges that the Secured Lenders authorized it to sue on their behalf (ECF No. 33, ¶ 11. c.), but that was true of the stock sellers in *Northern Trust*, 899 F.2d at 593,

10

and did not prove sufficient to make it the real party to the controversy in that case. Such authorization is consistent with a mere agency relationship.

Nor is the fact that FTUTB was a party to the contract (as the successor to the original administrative agent) sufficient to make it the real party to this controversy. FTUTB's relationship to the contract was akin to that of Northern Trust, which likewise was named in the stock purchase agreement "as the party to receive, on behalf of the sellers, any notices, requests, instructions, or other documents pursuant to the performance of the Agreement." *N. Tr. Co.*, 899 F.2d at 592 (internal quotation marks omitted). Ultimately, it is the Secured Lenders' rights under the Credit Agreement that this action seeks to vindicate; any right that FTUTB has is derived from and secondary to those of the Secured Lenders. *Cf. CCC Info. Servs.*, 230 F.3d at 347 ("CCC breached a contract with ASPA, not ASPA's members, and therefore ASPA is at the front line. ASPA is the party that feels the blow.").

Even when all relevant facts are considered cumulatively, FTUTB's relationship with the Secured Lenders is insufficient to render it the real party to this controversy. Most compelling is the language in the Credit Agreement itself, which provides, "The duties of Agent shall be mechanical and administrative in nature and Agent shall not have, or be deemed to have, by reason of this Agreement, any other Financing Document or otherwise a fiduciary relationship in respect of any Lender." (ECF No. 33-1 at 81-82, § 11.1.) FTUTB downplays the significance of this provision, chastising the defendants

11

for not citing "any cases for the proposition that an administrative agent cannot be the real party in interest absent fiduciary duties." (ECF No. 37 at 7.)

But the court cannot ignore how the FTUTB and the Secured Lenders chose to define their relationship. An entity whose duties with respect to a principal are merely "mechanical and administrative" is not the real party to a controversy involving the principal.

The Credit Agreement identifies FTUTB as an agent of the Secured Lenders, and that is, at best, what it is for purposes of diversity of citizenship. As, at best, a mere agent with respect to the matter in controversy, the court must look past its citizenship and to that of its principals, the Secured Lenders, when assessing diversity under 28 U.S.C. § 1332.

The court's conclusion is consistent with the recent decision in *CIBC Bank USA v. JH Portfolio Debt Equities, LLC*, No. 18 C 3964, 2020 U.S. Dist. LEXIS 181580 (N.D. Ill. Oct. 1, 2020). Plaintiff CIBC and seven others loaned the defendant $182 million, with CIBC putting up $45 million of that amount. The lenders collectively appointed CIBC as their administrative agent. When the defendant defaulted, CIBC brought suit. The court concluded that the other lenders were also real parties to the controversy and that their citizenship also must be considered for diversity purposes. *Id.* at *9.

FTUTB's efforts to distinguish *CIBC* (ECF No. 37 at 2, 11-12) are unpersuasive. It argues that the other lenders in *CIBC* retained significantly more authority than the

12

Secured Lenders here, including being able to force CIBC into, or preclude CIBC from, filing suit against the defendant. This fact appears to have been, at best, a secondary reason for the court's decision and offered merely as means of distinguishing certain out-of-circuit decisions that the court found unpersuasive. *CIBC Bank*, 2020 U.S. Dist. LEXIS 181580, *12. The court was clear that the basis for its conclusion was that, because the other lenders were the ones who were injured and CIBC was merely their agent, the other lenders were also real parties to the controversy. *Id.* at *9.

Moreover, the distinction that FTUTB attempts to make with *CIBC* does not appear to actually exist. FTUTB points to § 8.2 of the Credit Agreement as the basis for its authority to sue on behalf of the Secured Lenders. (ECF No. 37 at 6; 33-1 at 71, § 8.2.) But that section states that the "Agent may, and in any event shall, upon the written request of the Required First Out Lenders, the Required Lenders, or … the Required Last Out Lenders" take certain actions, one of which is "exercise any other rights and remedies available under the Financing Documents or applicable Law." FTUTB argues this means it has the discretion to sue. (ECF No. 33-1 at 71, § 8.2.) But read in light of the introductory clause, it is clear that, although FTUTB may sue, certain lenders also can require it to do so. In other words, FTUTB's discretion is not unfettered.

### 4. Conclusion

FTUTB "does not fit any of the exceptions to the general policy of testing diversity by the citizenship of the parties represented rather than the citizenship of the

13

representative ...." *N. Tr. Co.*, 899 F.2d at 595. The Secured Lenders are the real parties to the controversy. Although FTUTB, as administrative agent for the Secured Lenders, is vested with significant authority and discretion, that is an insufficient basis for overlooking the Secured Lenders' citizenship for diversity purposes. It is the Secured Lenders who allegedly "received the blow," *see Nat'l Asso. of Realtors*, 894 F.2d at 940, and the Secured Lenders who stand to benefit from any recovery.

The amended complaint is devoid of any details as to the citizenship of the Secured Lenders, and, consequently, FTUTB has failed in its burden to show that complete diversity, and thus jurisdiction, exists. Accordingly, the court must grant the defendants' motions to dismiss.

The defendants having abandoned their argument that the Secured Lenders are the real party in interest under Rule 17(a), the court is not concluding that the Secured Lenders must be made parties. The court concludes only that, to establish diversity jurisdiction under 28 U.S.C. § 1332(a), FTUTB must prove that the citizenship of the Secured Lenders is diverse from the citizenship of the defendants. Because the citizenship of the Secured Lenders may be completely diverse from the citizenship of the defendants, the jurisdictional defect of the amended complaint may be remediable. Therefore, the court will permit FTUTB leave to further amend the complaint. Because the court has not yet established its jurisdiction, it cannot consider the defendants' alternative arguments in support of their motions to dismiss.

14

**IT IS THEREFORE ORDERED** that the motions to dismiss filed by Vishal Lal, Thomas Stauss, (ECF No. 36) and Wisconsin Surgery Center LLC (ECF No. 34) are **granted**. The amended complaint is dismissed pursuant to Fed. R. Civ. P. 12(b)(1). Any amended complaint fully identifying the citizenship of the Secured Lenders may be filed within 14 days of this decision. If no amended complaint is filed within 14 days, at that time this action will be deemed dismissed without further action by the court.

Dated at Milwaukee, Wisconsin this 17th day of March, 2021.

_____
WILLIAM E. DUFFIN
U.S. Magistrate Judge